**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **TAMMY N. COMBS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:16-cv-00171-SLC** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** *sued as Nancy A.* | ) | |
| *Berryhill, Acting Commissioner of* | ) | |
| *Social Security Administration,*[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**OPINION AND ORDER**</u>

Plaintiff Tammy N. Combs appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI").[2]  (DE 1).  For the following reasons, the Commissioner's decision will be

REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in

accordance with this Opinion and Order.

## I.  PROCEDURAL HISTORY

Combs applied for DIB and SSI alleging disability as of January 23, 2013.  (DE 11

Administrative Record ("AR") 166-81).  The Commissioner denied Combs's application initially

and upon reconsideration.  (AR 105-23).  After a timely request, a hearing was held on

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge.  (DE 15); *see* 28 U.S.C. § 636(c).

November 21, 2014, before Administrative Law Judge Steven Neary ("the ALJ"), at which

Combs, who was represented by counsel, and a vocational expert, Robert Barkhaus (the "VE"),

testified. (AR 34-62). On January 21, 2014, the ALJ rendered an unfavorable decision to

Combs, concluding that she was not disabled because despite the limitations caused by her

impairments, she could perform a significant number of light-exertional jobs in the economy,

including cashier, sales attendant, and cafeteria attendant. (AR 17-28). The Appeals Council

denied Combs's request for review (AR 1-3), at which point the ALJ's decision became the final

decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Combs filed a complaint with this Court on May 19, 2016, seeking relief from the

Commissioner's final decision. (DE 1). Combs advances several arguments in this appeal,

asserting that the ALJ: (1) failed to account for all of her severe and non-severe impairments,

and the combination thereof, when assessing her residual functional capacity ("RFC"); (2) failed

to properly evaluate her obesity; and (3) improperly discounted the credibility of her symptom

testimony by failing to give weight to her strong work history and by overemphasizing her daily

activities, including that she was the caregiver for her disabled son. (DE 20 at 14-22).

## II. FACTUAL BACKGROUND[3]

At the time of the ALJ's decision, Combs was 46 years old (AR 166); had a high school

diploma and an associate's degree (AR 37, 206); and possessed past work experience as a

licensed practical nurse (AR 207). In her application, she alleged disability due to hypertension,

anemia, depression, heart disease, hypothyroidism, parathyroidism, anxiety, diabetes, obesity,

migraines, and plantar fasciitis. (AR 205). Later, she also alleged pain in her back, hips, feet,

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 410-page administrative record necessary to the decision.

shoulders, and hands, as well as numbness in her shoulders and hands.  (AR 232-33).

A.  *Combs's Testimony at the Hearing*

Combs testified as follows at the hearing:  Combs lives with her husband and her 28-year-old autistic son.  (AR 37).  She is five feet, two inches tall and weighed 222 pounds at the time.  (AR 37).  She had not had health insurance for the past few years.  (AR 42).

Combs stated that she could no longer work as a nurse due to "emotional problems" that began after her mother passed away.  (AR 38).  She experiences racing thoughts that impair her concentration and her ability to work.  (AR 43).  She frequently cries and gets very emotional.  (AR 43).  She had started attending counseling earlier in the year.  (AR 56).

When asked why she could not do some type of work other than nursing, Combs stated that her carpal tunnel syndrome causes numbness and tingling in her fingers and from her elbows to her wrist, causes her to drop things, and prevents her from lifting more than a gallon of milk.  (AR 38-39, 45-46).  She had experienced carpal tunnel syndrome symptoms for years, but it had worsened in the past two years.  (AR 42).

Combs also stated that a bulging disc in her neck prevents her from raising her arms above shoulder level and causes her constant pain from between her shoulder blades to the top of her neck.  (AR 39-41).  She had the neck pain when she was still working, but it had worsened in the past two years.  (AR 50).  She takes Neurontin for these symptoms, which causes her side effects of feeling dizzy, tired, and a dry mouth.  (AR 40).  Combs also stated that her legs swell during the day and that she has to lie down intermittently.  (AR 41).  This problem also occurred while she was working, but it had recently worsened.  (AR 50).  She estimated that she could stand for five minutes before needing to move for 20 minutes, and that she could walk for 50 to

100 feet before needing to rest due to her legs swelling. (AR 43-44, 52-53). For this problem, Combs elevates her legs intermittently and takes Hydrochlorothiazide and Lasix, which causes her to have to urinate frequently. (AR 41, 50-52). When asked whether she could perform a sedentary job, Combs stated that sitting exacerbates her upper back pain and that she can only sit for 30 minutes at a time. (AR 44-45).

When asked about her typical day, Combs testified that she primarily stays home, watches television, and performs some household tasks at her own pace. (AR 46-47, 53-54). She cannot vacuum or sweep the floors due to pain in her arms. (AR 47). She performs most of her self care independently, but sometimes needs assistance with washing or combing her hair or cleaning her bottom. (AR 47). She rarely drives a car, but does drive to the grocery nearby. (AR 47-48). The ALJ also asked Combs about information in the record indicating that she was caring for not only her autistic son, but also various other family members. (AR 48). Combs responded that her sister had now moved in and was helping her care for these family members. (AR 48).

*B. Summary of the Relevant Medical Evidence*

On February 27, 2012, Combs saw Dr. Bret Kueber at DeKalb Medical Services for her hypertension, diabetes, and hyperlipidemia. (AR 263-65). Her symptoms included fatigue. (AR 263). She had excellent compliance with medications and was without medication side effects. (AR 264). A musculoskeletal exam was normal, with full range of motion and strength. (AR 264). She was advised to engage in regular aerobic physical activity, such as brisk walking, for 30 minutes a day, most days of the week, and to avoid going barefoot or wearing tight fitting shoes. (AR 265).

4

On December 12, 2012, Combs went to the emergency room for discomfort in her mid-chest and right scapular region. (AR 271). A physical examination was normal other than minimal epigastric discomfort and trace edema in her ankles. (AR 271). Her blood pressure was initially 200/79, but during her visit it normalized to 153/66. (AR 271-72). A chest X-ray was normal. (AR 272). She was instructed to follow up with her family physician. (AR 272).

On February 11, 2013, Combs returned to the emergency room for a headache and high blood pressure. (AR 268-69). Her blood pressure was initially 188/88. (AR 268-69). However, after medications were administered, her blood pressure reduced to 144/75, and her headache resolved. (AR 268-69). She was to visit St. Martins Clinic the following day. (AR 268).

On February 28, 2013, Andrew Miller, Psy.D., completed a mental status exam at the request of the state agency. (AR 279-82). Combs told Dr. Miller that she had no life because she takes care of her husband who has dementia and her autistic son. (AR 280). She described her typical day as performing household chores, including cleaning, making the beds, and vacuuming. (AR 281-82). She was taking several medications, including Prozac, but did not think they were helping her; she complained of fatigue as a medication side effect. (AR 280). On mental status exam, Combs demonstrated sufficient attention, persistence, insight, understanding, and concentration; she had a good memory and was a good historian. (AR 282). Dr. Miller wrote that she was likely to have good social interactions. (AR 282). He opined that Combs's daily activities appeared to be simple and that her ability to sustain those efforts on a daily basis was slightly impaired. (AR 282). He assigned her a diagnosis of depressive disorder

not otherwise specified and a Global Assessment of Functioning ("GAF") score of 63.[4] (AR 282).

On March 4, 2013, William Shipley, Ph.D., a state agency psychologist, reviewed Combs's record and concluded that she had mild limitations in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace. (AR 75). Dr. Shipley wrote that Combs has a routine, cares for her autistic son and her disabled husband, does laundry, cleans, makes meals, drives, shops, manages finances, attends to her personal care, goes places alone, and needs no special reminders. (AR 76). Dr. Shipley concluded that Combs did not have a severe mental impairment. (AR 76). Several months later, Donna Unversaw, Ph.D., another state agency psychologist, reached the same conclusions as Dr. Shipley. (AR 87-88).

On March 26, 2013, Dr. H.M. Bacchus, Jr., performed a physical examination at the request of the Social Security Administration. (AR 284-87). Dr. Bacchus noted that Combs was overweight and moved slowly on and off the exam table. (AR 285). On physical exam, Combs had +1 pitting edema up to the knee in her left lower extremity and +2 pitting edema up to the knee in her right lower extremity. (AR 285). Her gait was slightly antalgic due to arthralgias

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

"The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, several medical personnel of record used a GAF score in assessing Combs, so the GAF is relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

and foot pain, but her gait sustainability was fair. (AR 285). She was able to walk on heels and toes, squat one-third of the way down, and hop gingerly; her tandem walk was clumsy. (AR 285). She had range of motion deficits in her neck, low back, shoulders, knees, and hips. (AR 285). Her muscle strength and tone, as well as her grip strength, were 4/5 in her right upper extremity and 5/5 in her left upper extremity. (AR 286). She had a flat affect and a mildly depressed mood; she was able to follow simple instructions and directions. (AR 286). Dr. Bacchus opined that Combs needed better blood pressure control. (AR 286). Dr. Bacchus's final impression included: hypertension, history of poor to fair control; type II diabetes; history of anemia; status post thyroidectomy/ parathyroidectomy, on thyroid replacement therapy; chest pains, treated as needed with Nitroglycerin; migraines; bilateral foot pain secondary to plantar fasciitis; obesity; depression and anxiety, treated with medication; hyperlipidemia; tobacco abuse, needs smoking cessation; and arthralgias, mild. (AR 286). Dr. Bacchus concluded that Combs could perform at least light duties, standing three to four hours in a six- to eight-hour workday, noncontinuous. (AR 286). He further opined that given her headaches that caused bouts of dizziness, Combs should avoid climbing ladders, working in unprotected heights, or operating heavy or dangerous equipment or machinery. (AR 286).

On March 27, 2013, Dr. B. Whitley, a state agency physician, reviewed Combs's record and assigned her "exertional limitations" of lifting 10 pounds frequently and 20 pounds occasionally; standing or walking for six hours in an eight-hour workday; and sitting for six hours in an eight-hour workday. (AR 68). Dr. Whitley assigned her "postural limitations" of frequent balancing, stooping, kneeling, crouching, and crawling; and occasional climbing ramps, stairs, ladders, ropes, and scaffolds. (AR 68-69). Several months later, Dr. J. Sands, another

state agency physician, reached the same conclusions as Dr. Whitley. (AR 89-90).

On January 10, 2014, Combs went to the emergency room for complaints of right-sided flank pain. (AR 384). An exam revealed right mid-abdominal tenderness. (AR 384). A neurological exam was unremarkable, and she had no edema in her extremities. (AR 384). A CT scan of her abdomen was negative. (AR 384). Combs was given Toradol, which provided her with good pain relief. (AR 384). The doctor concluded that Combs's pain was likely musculoskeletal in nature and instructed her to use Ibuprofen every eight hours as needed. (AR 384-85). An arterial Doppler ultrasound of her lower extremities later that month was normal. (AR 355).

On July 2, 2014, Combs saw Dr. Kueber for a routine periodic health screening and examination. (AR 363-65). Combs stated that she was gardening and doing yard work for exercise. (AR 363). She complained of fatigue, dizziness, back spasms, and pain in her tail bone. (AR 363). A depression screening was positive for an anxious mood, crying spells, guilt, sadness, and feelings of worthlessness. (AR 363). Dr. Kueber ordered X-rays due to Combs's complaints of neck and low back pain. (AR 364-65). The X-rays showed minimal spondylosis of the cervical spine, minimal lumbar spondylosis and L2-L3 disc space narrowing, and bilateral sacroiliac degenerative changes. (AR 349-50).

On August 24, 2014, Combs began participating in counseling services at the Northeastern Center. (AR 336). On September 16, 2014, Combs was evaluated by clinician Amy Scheeringa. (AR 338-41). Combs complained of feeling anxious, overwhelmed, tearful, apathetic, tired, and angry. (AR 338). She described a past traumatic experience where her mother collapsed and Combs performed CPR but could not save her mother; Combs stated this

8

trauma has caused her great difficulty with returning to work as a nurse. (AR 338). Combs also told Ms. Scheeringa that Combs is the caregiver for her autistic son, and her husband has dementia due to alcohol abuse; her sister, brother-in-law, and their three young children had also recently moved in with Combs, which was contributing to her anxiety and feeling overwhelmed. (AR 338-39). On mental status exam, Combs's mood was anxious and depressed, but her attitude was open and friendly. (AR 339). She presented with normal thought processes, appropriate insight and judgment, average intelligence, and intact cognition. (AR 340). She denied any suicidal or homicidal ideation or hallucinations. (AR 340). Ms. Scheeringa diagnosed Combs with a major depressive disorder, recurrent, moderate, and PTSD; and assigned her a current GAF score of 55 with a GAF score of 45 upon admission. (AR 340).

On August 20, 2014, Combs returned to Dr. Kueber with complaints of hand numbness and bilateral shoulder pain. (AR 360-62). An MRI of her cervical spine showed degenerative disc disease at C6-C7 with posterior disc bulging and protrusion contributing to mild to moderate central canal narrowing, but no significant flattening or compressive myelopathy. (AR 347-48).

On October 1, 2014, Combs saw Dr. Joshua Winters, an orthopedist, for a two-year history of pain in her neck and right arm. (AR 366-67). The pain had been worsening in the past few months; she was occasionally waking up at night and having to "shake her hand back alive." (AR 366). She reported feeling pins and needles in her last three fingers in both hands, right worse than left; aching pins and needles from the elbow to the wrist bilaterally; and numbness in her upper arm to the elbow. (AR 366). These symptoms made it difficult for her to grip and lift items. (AR 366). She weighed 212 pounds at the time and had a body mass index ("BMI") of 38.78. (AR 366). Her strength and range of motion were normal, but she had slightly decreased

9

sensation in her thumb, index, long, and small fingers on her right hand. (AR 367). A Tinel's

sign, a Phalen's test, and an ulnar stretch were all positive on the right. (AR 367). X-rays

showed cervical disc degeneration with disc space narrowing, bony osteophyte formation

anteriorly and posteriorly, seen most prominently at C5-C6 and C6-C7. (AR 367). Dr. Winters

also reviewed Combs's MRI, noting that it showed a C6-C7 disc herniation that was causing

cord compression as well as C7 nerve root impingement. (AR 367). Dr. Winters's impression

was carpal tunnel syndrome, cubital tunnel syndrome, and cervical disc herniation with C7

cervical radiculopathy. (AR 367).

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The

Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted). The decision will be reversed only if it is not supported by substantial

evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869

(7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative

record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or

substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner

are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212

(7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

### B. The Commissioner's Final Decision

On January 14, 2015, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 17-28). At step one of the five-step analysis, the ALJ found that Combs had not engaged in substantial gainful activity since her alleged onset date. (AR 19). At step two, the ALJ found that Combs had the following severe impairments: cervical degenerative disc disease; carpel tunnel syndrome, status post release surgery; and obesity. (AR 19). At step three, the ALJ concluded that Combs did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 23-24). Before proceeding to step four, the ALJ determined that Combs's symptom testimony was not fully credible (AR 26), and the ALJ assigned her the following RFC:

> [T]he claimant has the [RFC] to perform light work . . . except for no more tha[n] occasional climbing, crawling, crouching, kneeling or stooping. Additionally, the claimant is limited to no overhead lifting or reaching and no firm gripping with the right hand for use with tools.

(AR 24).

At step four, the ALJ found that Combs was unable to perform her past relevant work as a licensed practical nurse. (AR 26). Based on the RFC and the VE's testimony, the ALJ concluded at step five that Combs could perform a significant number of light-exertional jobs in

the economy, including cashier, sales attendant, and cafeteria attendant. (AR 27). Therefore, Combs's applications for DIB and SSI were denied. (AR 28).

### C. The RFC Assigned by the ALJ Necessitates a Remand

Combs argues, among other things, that the ALJ erred by failing to include limitations in the RFC about her ability to perform prolonged standing. Combs's assertions are persuasive, as the Court cannot trace the ALJ's reasoning regarding the RFC and Combs's ability to stand.

The RFC is a determination of the tasks a claimant can do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). In determining the RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996). In doing so, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'" because they "may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim." SSR 96-8p, 1996 WL 374814, at *5. Although an ALJ may decide to adopt the opinions in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. SSR 96-5p, 1996 WL 374183, at *4 (July 2, 1996). When assigning the RFC, the ALJ must sufficiently explain his reasoning to build an "accurate and logical bridge" between the evidence of record and the RFC. *Craft v. Astrue*, 539 F.3d 668, 673, 677 (7th Cir. 2008).

Here, the ALJ assigned Combs an RFC for light work with the additional limitations of only "occasional climbing, crawling, crouching, kneel, or stooping"; "no overhead lifting or reaching"; and "no firm gripping with the right hand for use with tools." (AR 24). Light work

requires, among other things, that "an individual be able to walk or stand for a total of six hours out of an eight-hour work day." *Thomas v. Colvin*, 534 F. App'x 546, 549 n.1 (7th Cir. 2013) (citations omitted); *see also Murphy v. Colvin*, 759 F.3d 811, 818 (7th Cir. 2014) (citations omitted); 20 C.F.R. §§ 404.1567(b), 414.967(b) (stating that light work requires "a good deal of walking or standing"); SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983) (same).

When assigning the RFC, the ALJ considered the medical source opinions, the objective medical evidence, Combs's daily living activities, and Combs's subjective complaints. (AR 24-26). As to the medical source opinions, the ALJ observed that Dr. Bacchus found that Combs could perform at least light duties; could stand three to four hours a day in a six- to eight-hour workday, noncontinuous; but should avoid climbing ladders, unprotected heights, and operating dangerous equipment or machinery. (AR 26, 286). The ALJ then assigned "the exertional portion" of Dr. Bacchus's opinion "great weight," finding it "consistent with the clinical and diagnostic evidence of record . . . [and] the state agency reviewers' opinions." (AR 26). The ALJ gave the rest of Dr. Bacchus's opinion "little weight," stating that it "appears to be based upon the claimant's subjective complaints and not upon any clinical or diagnostic evidence." (AR 26).

In assigning this weight, however, the ALJ mischaracterized the medical source opinions. *See Terry v. Astrue*, 580 F.3d 471, 477-78 (7th Cir. 2009) (remanding case where the ALJ mischaracterized the record); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (same). The exertional portion of Dr. Bacchus's opinion is *not* consistent with the exertional portion of the opinions of Drs. Whitley and Sands, the state agency physicians. Under the regulations, an "exertional activity" is defined as "[o]ne of the primary strength activities (sitting, standing,

walking, lifting, carrying, pushing, and pulling) defining a level of work." SSR 83-10, 1983 WL

31251, at *5 (Jan. 1, 1983). The exertional portion of Drs. Whitley's and Sands's opinions, to

which the ALJ also assigned "great weight," indicates that Combs could stand or walk about six

hours in an eight-hour workday. (AR 26, 68, 89). Dr. Bacchus, however, limited Combs to

standing just three or four hours in a six- to eight-hour workday. (AR 286). Additionally, Dr.

Bacchus stated that Combs's standing must be "noncontinuous," which indicates a sit-to-stand

option was necessary, but Drs. Whitley's and Sands's opinions made no mention of a sit-to-stand

option. (*Compare* AR 286, *with* AR 68, 89).

It is the ALJ's duty, not the Court's, to confront and resolve conflicts in the medical

evidence. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("We . . . are presented with the

not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve

that conflict."). The ALJ, however, never confronted and resolved this conflict among the

medical source opinions, instead confusingly assigning "great weight" to both "the exertional

portion" of Dr. Bacchus's opinion *and* "the exertional portion" of Drs. Whitley's and Sands's

opinions. (AR 26). As a result, the Court cannot "trace the path of [the ALJ's] reasoning"

pertaining to his consideration of the medical source opinions and Combs's ability to perform

prolonged standing. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

Nor is there a basis on this record upon which to conclude that the ALJ's oversight is

mere "harmless error." *See Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that

harmless errors are those that do not ultimately impact the outcome of the determination). That

is, there is no testimony from the VE that a hypothetical individual with Combs's RFC could still

perform a significant number of jobs even if the additional limitations of standing four hours

total in an eight-hour workday and a sit-to-stand option were included in the RFC. (*See* AR 57-61).

Moreover, Combs has various conditions that likely make prolonged standing difficult for her, including obesity, leg edema, and plantar fasciitis. (*See, e.g.*, AR 25-26, 285-86); *see generally Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) (articulating that when assigning an RFC, an ALJ must consider the combination of all limitations on the ability to work, whether severe or non-severe). In fact, as to obesity, the ALJ wrote: "It would be expected that [Combs's] obese condition would exacerbate her symptomology by diminishing her ability to perform basic exertional activities such as sitting, *standing*, lifting and walking, which are necessary in a competitive work environment." [6] (AR 25-26 (emphasis added)); *see Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("[T]he ALJ must specifically address the effect of obesity on a claimant's limitations because, for example, a person who is obese and arthritic may experience greater limitations than a person who is only arthritic." (citing *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004))). Consequently, the ALJ must confront and resolve the conflict between the exertional portion of Dr. Bacchus's opinion and the exertional portion of the opinions of Drs. Whitley and Sands, both to which he assigned "great weight." (AR 26).

In sum, the Court cannot trace the ALJ's logic with respect to the weight he assigned to the medical source opinions when crafting Combs's RFC about her ability to perform prolonged standing. Consequently, the Commissioner's final decision will be remanded so that the ALJ

---

[6] Furthermore, the ALJ seemed to view Combs's daily activities—in particular, her acting as a caregiver for her disabled family members—as more than minimal in nature. (AR 22, 24-25). However, Combs stated that she performs these tasks at her own pace, resting intermittently between activities. (AR 41, 43-44, 46, 55, 284). Thus, there is no indication that Combs's daily activities require her to perform prolonged standing up to six hours in an eight-hour time period. *See Craft*, 539 F.3rd at 680 (cautioning the Commissioner not to place undue weight on a claimant's daily activities).

may resolve the conflict in the medical source opinions concerning Combs's ability to perform

prolonged standing and to build an accurate and logical bridge between the evidence and

Combs's RFC.[7]

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case

is REMANDED to the Commissioner for further proceedings in accordance with this Opinion

and Order. The Clerk is directed to enter a judgment in favor of Combs and against the

Commissioner.

SO ORDERED.

Entered this 28th day of March 2018.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

---

[7] Because a remand is necessary for the ALJ to resolve the conflict in the medical source opinions about Combs's ability to perform prolonged standing and to build an accurate and logical bridge between the evidence and Combs's RFC, the Court need not reach Combs's other arguments.

Having said that, because the case is already being remanded and because Combs raised an argument concerning her work history, the ALJ is encouraged upon remand to also address Combs's work history as a factor in the ALJ's credibility determination of Combs's symptom testimony. *See Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (concluding that the ALJ's silence about the claimant's work history was "not enough to negate the substantial evidence supporting the adverse credibility finding"); *Reed v. Colvin*, 656 F. App'x 781, 787 (7th Cir. 2016) (same); *see also Stark v. Colvin*, 813 F.3d 684, 689 (7th Cir. 2016) ("An ALJ is not statutorily required to consider a claimant's work history, but a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of disability." (citation and internal quotation marks omitted)); *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015) (observing that a claimant's work history may also undermine a claimant's claim of disabling symptoms where "the claimant has had essentially the same condition for decades, and remained able to work" (citations omitted)).